UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UTC FIRE & SECURITY AMERICAS
CORP., INC.,

        Plaintiff,

-v-

NCS POWER, INC.,

        Defendant.

-------------------------------------------------------x

NCS POWER, INC.,

        Third-Party Plaintiff,

-v-

YOKU ENERGY TECHNOLOGY, INC.,

        Third-Party Defendant.

-------------------------------------------------------x

No. 10 Civ. 6692 (LTS)(THK)

### MEMORANDUM OPINION AND ORDER

In this breach of contract action, third-party Plaintiff NCS Power, Inc. ("NCS") asserts that third-party Defendant Yoku Energy Technology Ltd. ("Yoku") supplied non-conforming lithium-ion batteries to Plaintiff UTC Fire & Security Americas Corp., Inc. ("UTC"). Yoku now moves for summary judgment, arguing that this Court lacks personal jurisdiction over Yoku. The Court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332 and has considered carefully all of the parties' submissions and arguments. For the following reasons, Yoku's motion for summary judgment is denied.

## BACKGROUND

The following facts are drawn from the parties' submissions, and are undisputed unless otherwise indicated.[1]

Yoku is a corporation headquartered in Hong Kong which operates a lithium-ion battery plant in Zhangzhou, China through its subsidiary Yoku Energy (Zhangzhou) Co., Ltd. Yoku's batteries are used in consumer electronics worldwide, including in the United States. (See Exhibit B to Affidavit of Gerald Grunsfeld ("Grunsfeld Aff.")). NCS is a Washington-based corporation that provides batteries and power supply equipment to customers throughout North America.

At all relevant times, Yoku and NCS maintained a contractual relationship pursuant to a written agreement ("Agreement"), under which NCS agreed to serve as Yoku's "agent/sales representative" for distribution of Yoku's lithium polymer battery products in North America and to "actively and diligently solicit[] trade" of Yoku's products in that territory. (Agreement, Exhibit 2 to Affidavit of Lance Chandler ("Chandler Aff.") §§ 2.1, 3.1). NCS was authorized to sell Yoku battery products in North America, but Yoku's written approval was required for each order, and approved orders could not be revised or canceled without Yoku's consent. (Id., §§ 1.2, 2.5, 5.3). The Agreement further provided that if NCS fulfilled its commitment to sign $10 million worth of battery orders in 2008, it would retain its right to act as Yoku's agent/sales representative. (Id. § 2.5). Battery shipments were governed by the delivery

---

[1] Yoku, the moving party, has failed to comply with its obligation under Local Rule 56.1 to submit a statement of undisputed facts. The facts characterized as undisputed here are thus drawn from evidence as to which there is no nonconclusory contrary factual proffer. Although the Court has discretion to deny the motion in light of Yoku's noncompliance with the Local Rule, the Court has considered the merits of Yoku's arguments.

term FOB ("Free on Board") Xiamen or Hong Kong. (Id. § 6.4).

Pursuant to this Agreement, NCS agents solicited business on Yoku's behalf from companies throughout North America, including three located in New York. (Chandler Aff. ¶¶ 6, 12-23). NCS's New York solicitation efforts culminated in one sale, which consisted of a contract to custom-design and deliver prototype batteries to Medis Technology. (Id. ¶¶ 15-17). NCS asserts in an affidavit appended to its opposition papers that Medis Technology ordered the prototype batteries with the intent of purchasing approximately 200,000 Yoku batteries every month if the batteries conformed to Medis Technology's specifications; however, NCS's papers are silent as to whether those further orders were ever placed. (Id. ¶ 18). NCS also contends that Yoku batteries were incorporated into various products that were sold throughout the United States, including in New York. (Id. ¶¶ 20-23).

Beginning in or about August 2007, UTC, a Delaware corporation with its principal place of business in Florida, began placing orders with NCS for custom-designed lithium-ion batteries.[2] These batteries were intended for use in "ActiveKEY," a mobile device used by realtors to track listing information about properties and remotely unlock lock boxes. UTC provided battery specifications to NCS, which were then passed on to Yoku. (Exhibit C to Grunsfeld Aff.). More than 300,000 Yoku-manufactured batteries were delivered pursuant to the orders to UTC's premises in Salem, Oregon. (Third-Party Compl. ¶ 24). Upon receiving the battery shipments, UTC installed them into the ActiveKEY devices and distributed them to

---

[2]   UTC was formerly known as GE Fire and Security, Inc., and was owned by the General Electric Company ("GE"). On March 1, 2010, UTC purchased GE Fire and Security, including all of its capital stock, and continued its business under the name UTC. (Compl. ¶ 3). The term "UTC," as used herein, refers collectively to the post-March 1, 2010 UTC and the pre-March 1, 2010 GE Fire and Security.

realtors, several of which were located in New York. (Declaration of Janet Kush ("Kush Decl.") ¶¶ 5-15).

In April and May 2009, at least 21 of the ActiveKEY batteries began to malfunction and overheat during use. (Compl. ¶ 21). UTC contacted Yoku for technical support and sent inspectors to the Zhangzhou factory to determine the cause of the malfunctions. (See Exhibits 3 & 4 to Declaration of Gary Stahl ("Stahl Decl.")). UTC alleges that its investigators observed that Yoku's factory employees were not manufacturing the batteries according to the proper specifications, and concluded that the deviations caused the malfunctions. UTC was forced to replace approximately 35,000 batteries and design and install a "firmware" solution that reduced the likelihood of overheating, but also diminished the battery life. (Stahl Decl. ¶ 6; Exh. 4 to Stahl Decl.). UTC alleges that the cost of its remedial measures will total $8 million. (Compl. ¶¶ 28, 45). In an affidavit proffered in response to the instant motion, a principal of NCS asserts that "[it] is [his] understanding that over 4,000 YOKU batteries that are the subject of this lawsuit were used, consumed and allegedly caused damage in New York." (Chandler Aff. ¶27; see also Kush Decl. ¶¶ 7-15 (cataloging thousands of ActiveKEY devices sold to New York realtors)).

On September 8, 2010, UTC filed a complaint against NCS principally for breach of contract and negligence in the design of the batteries.[3] On November 9, 2010, NCS filed a third-party complaint against Yoku, asserting, inter alia, breach of contract, products liability and negligence claims. Yoku filed a motion for summary judgment, asserting that this Court lacks personal jurisdiction over it under New York State's Civil Practice Law and Rules §§ 301 and

---

[3] Venue in this Court was based on an agreement by UTC and NCS to designate the Southern District of New York as the exclusive forum for litigating disputes arising from their agreement. (Compl. ¶ 6).

302. Both NCS and UTC filed papers in opposition to Yoku's motion.

## DISCUSSION

The "plaintiff ultimately 'bears the burden of establishing jurisdiction over the defendant by a preponderance of the evidence,'" but "'need only make a prima facie showing that jurisdiction exists prior to the holding of an evidentiary hearing.'" Capitol Records, LLC v. VideoEgg, Inc., 611 F. Supp. 2d 349, 356 (S.D.N.Y. 2009) (quoting Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 196 (2d Cir. 1990)). "In deciding a motion to dismiss for lack of personal jurisdiction, the court has discretion to proceed either upon written submissions or through a full evidentiary hearing on the merits," but, without a hearing or jurisdictional discovery, "the pleadings and affidavits are construed, and any ambiguity is resolved, in favor of the plaintiff." Taylor Devices, Inc. v. Walbridge Aldinger Co., 538 F. Supp. 2d 560, 575 (W.D.N.Y. 2008) (internal citations omitted). As the third-party plaintiff asserting jurisdiction, NCS has the burden on this pre-discovery motion practice to proffer a prima facie showing that the Court has personal jurisdiction over Yoku.

Courts conduct a two-part inquiry to determine whether the assertion of personal jurisdiction is appropriate: "First, [the Court] must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." Metro. Life Ins. Co. v. Robertson–Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).

I. General Jurisdiction

Under New York Civil Practice Laws and Rules § 301, a court may exercise general jurisdiction over a foreign corporation on any cause of action if the defendant is

"engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." McGowan v. Smith, 52 N.Y.2d 268, 272 (1981) (quoting Simonson v. Int'l Bank, 14 N.Y.2d 281, 285 (1964)); accord Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985). To warrant the exercise of general jurisdiction, New York law requires that the defendant be present in New York "not occasionally or casually, but with a fair measure of permanence and continuity." Landoil Resources Corp. v. Alexander & Alexander Svcs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1991) (internal citations omitted).

New York courts have focused on several indicia to support a finding that a defendant was "doing business," including "the existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New York." Id. at 1043. Solicitation alone will not ordinarily show that a defendant is "doing business" in New York. Schultz v. Safra Nat'l Bank, 377 Fed. Appx. 101, 102 (2d Cir. 2010). However, under the so-called "solicitation-plus" test, "if the solicitation of business is substantial and continuous, then personal jurisdiction may be found to exist as long as the defendant engages in other activities of substance in the state." Nelson v. Mass. Gen. Hosp., No. 04 Civ. 5382(CM), 2007 WL 2781241, at *14 (S.D.N.Y. Sep. 20, 2007) (citing Landoil, 918 F.2d at 1043-44). To meet that test, the direct sales into the New York market must constitute a significant portion of the defendant's business activities. See, e.g., Garcia v. Nationwide Machinery Sales, No. 08 Civ. 4167(SJF), 2009 WL 2992574, at *3 (E.D.N.Y. Sept. 16, 2009) (no general jurisdiction where defendant maintained a website, sent business communications to New York-based plaintiff, and earned one million dollars of revenue in New York where that revenue constituted only 1% of defendants' sales over that period); see also Sound Around Inc. v. Audiobahn, Inc., No. 07 Civ. 773(RJD), 2008

WL 5093599, at *5 (E.D.N.Y. Nov. 24, 2008) ("[C]ourts often look to the volume of the defendant's sales in New York as a fraction of its total sales to determine whether a finding of 'solicitation-plus' can be made.").

NCS does not contend that Yoku has an office, bank account, employees, or other property in New York. The only facts NCS proffers in support of general jurisdiction are (1) Yoku's website, which was accessible in New York; (2) NCS's sale of batteries outside New York that were used in products sold within New York; (3) NCS's (apparently unsuccessful) solicitation of two New York-based customers; and (4) NCS's successful solicitation of Medis Technology, which resulted in a contract to design and deliver an unspecified number of prototype batteries. These facts are insufficient to warrant the exercise of general jurisdiction under § 301.

It is well-established that a website accessible to New York residents – even a website with interactive components – is insufficient to support general jurisdiction. See, e.g., Virgin Enterprises Ltd. v. Virgin Eyes LAC, No. 08 Civ. 8564(LAP), 2009 WL 3241529, at *3-4 (S.D.N.Y. Sept. 30, 2009); Best Van Lines, Inc. v. Walker, No. 03 Civ. 6585, 2004 WL 964009, at *5 (S.D.N.Y. May 5, 2004). Morever, "mere sales of a manufacturer's product in New York, however substantial, have never made the foreign corporation manufacturer amenable to suit in this jurisdiction." Delagi v. Volkswagenwerk A.G. of Wolfsburg, Germany, 29 N.Y.2d 426, 433 (1972); see also Gallelli v. Crown Imports, LLC, 701 F. Supp. 2d 263, 271 (E.D.N.Y. 2010) ("'solicitation-plus' standard is not satisfied merely through sales of a manufacturer's product in New York").

The only remaining basis for general jurisdiction over Yoku is NCS's solicitation of three New York companies and its contract with Medis Technology. Three isolated acts of

solicitation do not qualify as "substantial and continuous." See, e.g., Torres v. Monteli Travel, Inc., No. 09 Civ. 2714(ARR), 2011 WL 2670259, at *6-7 (E.D.N.Y. July 7, 2011) (musician's 13 acts of solicitation and 82 one-day performances in New York over two years is "minimal, not substantial and continuous"). Furthermore, NCS has not made any showing that the business it conducted with Medis Technology – which resulted in an unknown number of battery sales – constituted a substantial portion of Yoku's sales in the United States. Courts have regularly declined to exercise general jurisdiction where the defendant's in-state solicitation efforts were considerably more extensive. See, e.g., Copterline Oy v. Sikorsky Aircraft Corp., No. 06 Civ. 6787(ILG), 2007 WL 2687661, at *7 (E.D.N.Y. Sept. 10, 2007) (citing cases holding that, where a foreign corporation derives less than 5% of its overall revenue from sales in New York, such sales are not substantial enough to confer personal jurisdiction under the solicitation-plus test); New World Capital Corp. v. Poole Truck Line, Inc., 612 F. Supp. 166, 171-72 (S.D.N.Y. 1985) (no general jurisdiction where trucking company executives made eight trips to New York over four years and $300 million hauling goods in and out of New York where those activities were 1.5% of company's total business activities).[4]

---

[4] See also Law Debenture v. Maverick Tube Corp., No. 06 Civ. 14320(RJS), 2008 WL 4615896, at *5 (S.D.N.Y. Oct 15, 2008) (no general jurisdiction where corporation: (1) lists its shares on the NYSE; (2) holds investor relations events in New York once a year; (3) publicly proclaims New York to be its "local community;" (4) utilizes the offices of its parent company in New York; (5) regularly enlists the services of New York counsel; (6) negotiated at least two major transactions in New York; and (7) maintains a website accessible in New York); Brought to Life Music, Inc. v. MCA Records, Inc., No. 02 Civ. 1164(BNA), 2003 WL 296561, at *4 (S.D.N.Y. Feb. 11, 2003) (no jurisdiction over a defendant who: "(i) [is] involv[ed] with musical recordings produced in New York; (ii) derive[s] income from the sale of musical recordings nationwide, including New York; (iii) [does] musical performances in New York; and (iv) [has] a co-publishing relationship with a New York entity").

NCS has thus failed to carry its burden of proffering a prima facie demonstration of a basis for the exercise of general jurisdiction over Yoku pursuant to N.Y. C.P.L.R. § 301.

II.     Specific Jurisdiction

NCS also asserts that the Court can exercise jurisdiction over Yoku based on either N.Y. C.P.L.R. § 302(a)(1) or § 302(a)(3), which provide for the exercise of specific long-arm jurisdiction.

A.     N.Y. C.P.L.R. § 302(a)(1)

Section 302(a)(1) provides for personal jurisdiction over a non-domiciliary who "in person or through an agent . . . contracts anywhere to supply goods or services" in New York. N.Y. C.P.L.R. 302(a)(1) (McKinney 2010). Long-arm jurisdiction may be exercised in such circumstances "even if a defendant never enters the state to negotiate one of these contracts, to complete performance or for any other reason." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 789 (2d Cir. 1999).

NCS advances two arguments in support of jurisdiction under this subsection. First, NCS contends that its solicitation and sale of batteries on Yoku's behalf to companies in New York is sufficient to support the exercise of specific jurisdiction. Second, NCS notes that its agreement with Yoku contemplates a significant volume of battery sales throughout North America, a territory inclusive of New York; thus, Yoku should have foreseen that the batteries would enter New York. In support of the second argument, NCS points to several copyright cases in which New York courts found jurisdiction over non-domiciliary defendants based on distribution agreements that authorized the licensing of songs "in the United States." See Firma Melodiya v. ZYX Music GmbH, No. 94 Civ. 6798(DC), 1995 WL 28493, at *2 (S.D.N.Y. Jan. 25, 1995); Meyer v. Sharron, No. 86 Civ. 9291(TPG), 1986 WL 8311, at *1-*2 (S.D.N.Y. July

24, 1986); Greenky v. Irving Music, Inc., 80 Civ. 2776(GLG), 1981 WL 1370, at *1-*2 (S.D.N.Y. July 13, 1981).

NCS's argument is deficient in one crucial respect: it fails to tie NCS's cause of action to the business that it conducted on Yoku's behalf in New York. "[L]ong-arm jurisdiction over a non-domiciliary exists where (i) a defendant transacted business within the state and (ii) the cause of action arose from that transaction of business. If either prong of the statute is not met, jurisdiction cannot be conferred under CPLR 302 (a)(1)." Johnson v. Ward, 4 N.Y.3d 516, 519 (2005) (emphasis added); see also Armouth Intern., Inc. v. Haband Co., Inc., 277 A.D. 2d 189 (2d Dep't 2000) (no personal jurisdiction over New Jersey company that supplied goods to New York where the cause of action arose out of defendant's breach of contract in Georgia).

Here, the second prong is absent. The cause of action arises out of a discrete set of batteries that Yoku custom-designed for UTC,[5] not its solicitation and sales efforts directed toward other companies in New York. It is undisputed that neither Yoku nor NCS contracted to supply the defective batteries that are at issue here to New York. In fact, NCS's complaint states that NCS delivered the batteries from China to UTC's premises in Salem, Oregon (Third-Party Compl. ¶ 24). The parties' submissions make it clear that, thereafter, UTC oversaw their distribution to realtors in New York. (Kush Decl. ¶¶ 5-15). The copyright cases on which NCS relies do not depart from the rule that the cause of action must arise from the business transacted in New York. In each of those cases, that nexus was present: the courts properly asserted

---

[5] When, as here, a defendant files a third-party action seeking indemnification, the relevant "injury" for the purpose of § 302(a)(3) is the one complained of in the primary action – here, the injury sustained by UTC in replacing the batteries and installing the firmware. See Chunky Corp. v. Blumenthal Bros. Chocolate Co., 299 F. Supp. 110, 114 (S.D.N.Y. 1969).

personal jurisdiction because, as the background facts make clear, the claims were based on improper licensing and distribution of the copyrighted material in New York.

NCS has thus failed to carry its burden of proffering a prima facie demonstration of a basis for the exercise of specific long-arm jurisdiction over Yoku pursuant to N.Y. C.P.L.R. § 302(a)(1).

B.  N.Y. C.P.L.R. § 302(a)(3)

NCS also asserts that the Court has jurisdiction over Yoku under § 302(a)(3), which provides for specific jurisdiction over a non-domiciliary who "in person or through an agent":

> commits a tortious act without the state causing injury to person or property within the state . . . if [the non-domiciliary]:
>
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y. C.P.L.R. § 302(a)(3) (McKinney 2010).

Yoku does not contest that its allegedly negligent manufacture of the batteries in China constitutes a tortious act without the state. It does, however, halfheartedly dispute the presence of an injury within the state, citing the rule that courts cannot exercise jurisdiction under § 302(a)(3) where the "economic consequence of what transpired in [another state] may be felt in New York due to the fortuitous location of plaintiffs in New York." (Yoku Memo. at 18 (quoting American Para Professional Systems, Inc. v. LabOne, Inc., 175 F. Supp. 2d 450, 456 (E.D.N.Y. 2001)). That rule is inapposite here.

In determining whether there is an injury in New York sufficient to warrant jurisdiction under § 302(a)(3), courts apply a "situs-of-injury" test, which requires them to identify "where the first effect of the tort was located that ultimately produced the final economic injury." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 792 (2d Cir 1999). Here, NCS and UTC allege that, immediately upon being apprised of the batteries' defects, UTC was forced to undertake costly corrective action to mitigate damages – specifically, replacing batteries or installing a "firmware" solution in some 4,000 ActiveKEY devices in New York, as well as in such devices located in other parts of the country. (UTC Opp. at 12-13; Stahl Decl. ¶ 6; Exh. 4 to Stahl Decl.). UTC also asserts that it may be forced to replace the remaining batteries in New York; that the firmware solution decreased the battery life; and that it is likely to lose customers in New York who cease using the ActiveKEY devices due to the diminished battery life. These allegations are sufficient to demonstrate injury "within the state." See Sung Hwan Co. v. Rite Aid Corp., 7 N.Y.3d 78, 84-85 (2006) (loss of business or customers in New York constitutes "injury within the state" for purposes of § 302(a)(3)); Cosmetech Int'l, LLC v. Der Kwei Enter. & Co., 943 F. Supp. 311, 319 (S.D.N.Y. 1996) (same); Cleopatra Kohlique, Inc., v. New High Glass, Inc., 652 F. Supp. 1254, 1257 (E.D.N.Y. 1987) (same); Sybron Corp. v. Wetzel, 46 N.Y.2d 197 (1978) (anticipated loss of customers and business suffices for purposes of § 302(a)(3)).

NCS also makes a prima facie showing that it meets the factors outlined in § 302(a)(3)(ii). Yoku's protestations notwithstanding, there is no doubt that Yoku derives substantial revenue from international commerce. Yoku's website states that it is "active in developing domestic and international markets, and that its "sales network" covers North America, Europe, South and East Asia, and other regions (Exh. 5 to Stahl Decl.); that it strives to be the "No.

1 supplier of lithium-ion batteries in the world" (id.); and that it has established a "support network" in America, Europe, among other venues. (Id.; Exh. 6 to Stahl Decl.). In addition, the NCS-Yoku agreement commited NCS to make $10 million worth of battery sales in 2008 alone. (Chandler Aff. § 2.5). As to the foreseeability prong of § 302(a)(3)(ii), "[t]he test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one." Kernan v. Kurtz-Hastings, Inc., 175 F.3d 236, 241 (2d Cir. 1999) (quoting Allen v. Auto Specialties Mfg. Co., N.Y.S.2d 547, 550 (3d Dep't 1974)). In addition to meeting this objective test, a plaintiff must make some showing of "'a purposeful New York affiliation [by Defendant], for example, a discernible effort to directly or indirectly serve the New York market.'" Kernan, 175 F.3d at 241 (quoting Schaadt v. T.W. Kutter, Inc., 564 N.Y.S.2d 865 (3d Dep't 1991.)). Here, NCS has shown both. It is reasonable to infer that, when Yoku delivered a high volume of batteries (over 300,000 in this case) to a major electronics distributor in North America, it did so with the expectation – indeed, the hope – that they would be sold to customers in markets throughout the United States. Given the size of the New York market and the quantity of batteries placed into the U.S. stream of commerce, it strains credulity that Yoku could not have foreseen that its actions would have consequences in New York.

Accordingly, the Court finds that it can properly exercise long-arm jurisdiction over Yoku pursuant to § 302(a)(3).

C. Due Process

Having established that Yoku falls within the reach of New York's long-arm statute, the Court must ascertain whether the exercise of jurisdiction over Yoku comports with the guarantees of due process. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305

F.3d 120, 127 (2d Cir. 2002). The due process analysis involves two related inquiries: the "minimum contacts" inquiry and the "reasonableness" inquiry. Id.

The first of these inquiries is "whether the defendant has 'certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Id. (quoting U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 152 (2d Cir. 2001)). As a general rule, a court may not exercise coercive authority over a defendant unless it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

While Yoku vigorously contests this Court's statutory jurisdiction, Yoku's treatment of the due process issue in its opening brief is limited to scattered, conclusory assertions that it lacks minimum contacts with New York. NCS and UTC, by contrast, argue that Yoku has minimum contacts with New York by virtue of its solicitation efforts and sales in New York, and – most importantly – its placement of over 300,000 defective batteries in the U.S. stream of commerce. This, NCS and UTC contend, was done with the expectation that some would be used in New York.

The soundness of the "stream of commerce" theory has been called into question by the Supreme Court's recent ruling in J. McIntyre Machinery, Ltd. v. Robert Nicastro, 131 S. Ct. 2780 (2011), in which a plurality rejected a wholly "stream of commerce"-based assertion of personal jurisdiction based on the location of a single machine in the forum state. The plurality concluded that the distribution of goods with the expectation that they may reach a forum state does not, by itself, constitute purposeful availment, and that courts may exercise jurisdiction "only where the defendant can be said to have targeted the forum." Id. at 2788. In J. McIntyre,

the defendant was a UK company that had neither marketed its goods in the forum state nor shipped them there. The company's goods were sold only to an independent U.S. distributor and there was no allegation that the distributor was under the manufacturer's control. While the manufacturer had attended and displayed machines at annual industry conventions in the United States, none of the conventions had been held in the forum state, and no more than four (possibly only one) of the machines in question had "ended up" in the forum state. Id. at 2786. The trial court had found that the manufacturer had "not a single contact with [the forum state] short of the machine in question ending up in this state." Id. at 2790 (internal quotations omitted). The plurality found no purposeful availment of the forum market on the manufacturer's part, specifically rejecting the claim that the manufacturer's agreement with the independent distributor to sell the machines in the United States was sufficient grounds for exercising jurisdiction based on a "stream of commerce" rationale. Id.

However, because no opinion in J. McIntyre commanded five votes, Justice Breyer's concurrence controls.[6] Justice Breyer declined to adopt the plurality's holding that mere foreseeability that goods could wind up in a particular state could never form a constitutionally sufficient basis for the exercise of personal jurisdiction under the stream-of-commerce theory. Id. at 2791-93. Instead, he found the specific facts of the case insufficient to support personal jurisdiction even under the Court's earlier precedents,

---

[6] See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotations omitted); see also Ainsworth v. Cargotec USA, Inc., No. 10 Civ 236(KS), 2011 WL 4443626, at *7 (S.D. Miss. Sept. 23, 2011) (treating Justice Breyer's concurrence as controlling and stating that "[a]t best, [J. McIntyre] is applicable to cases presenting the same factual scenario that it does").

emphasizing that the defendant had made only a "single isolated sale" through an independent distributor into the forum state. Id. at 2791-92. His concurrence did not foreclose the possibility that a court might exercise jurisdiction where there is a "regular course of sales" of defendant's goods in the forum state, or "something more, such as special state-related design, advertising, advice, marketing or anything else." Id. (internal quotations omitted).

       The plurality opinion in J.McIntyre, accordingly, does not categorically foreclose the exercise of personal jurisdiction based on a "stream of commerce" theory; nor does it preclude this Court from considering other facts in addition to the presence of defective Yoku batteries in New York. Here, Yoku had an agency agreement – not an independent distributorship agreement – with NCS, under which orders could not be fulfilled without Yoku's specific approval. Pursuant to that agreement, NCS solicited business within the New York market and actually sold Yoku batteries to at least one New York customer (albeit not the customer whose purchases underlie the claims in this case). Yoku specially manufactured the hundreds of thousands of batteries that were sold to UTC under what was, presumably, an order or orders approved by Yoku. The volume of sales, Yoku's presumptive knowledge thereof, and the fact that the batteries were sold to a national company, combined, create a strong inference of an expectation of true national distribution of the batteries – a significantly stronger inference than that which could be drawn from the J.McIntyre defendant's sale of what appears to have been a far more limited number of units to an independent U.S. distributor. The Court concludes that the record is sufficient to demonstrate that Yoku has availed itself of the benefits and protections of New York law in a manner that, while insufficient to support general jurisdiction

under the New York statute,[7] is sufficient to meet the constitutional minimum contact requirement.

The second prong of the due process test – the reasonableness inquiry – asks "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice – that is, whether it is reasonable under the circumstances of the particular case." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996). The Second Circuit has instructed courts to consider five factors in evaluating reasonableness: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Id. at 568. "Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Bank Brussels Lambert, 305 F.3d at 129 (citation and internal quotation marks omitted). Yoku has made no such compelling demonstration.

---

[7] Because the standard for purposeful availment under the due process clause is more lenient than the standard for general jurisdiction under N.Y. C.P.L.R. § 301, it is possible for a party's contacts to satisfy the former but not the latter. Compare Burnham v. Superior Court of Cal., County of Marin, 495 U.S. 604 (1990) (holding that a court could exercise personal jurisdiction, consistent with due process, over a nonresident who was only briefly in the state, for purposes unrelated to the cause of action) with Landoil Resources Corp. v. Alexander & Alexander Svcs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1991) (statutory general jurisdiction requires a presence "not occasionally or casually, but with a fair measure of permanence and continuity").

Accordingly, the Court finds that its exercise of personal jurisdiction over Yoku is consistent with due process.

## CONCLUSION

For the foregoing reasons, Yoku's motion for summary judgment is denied. This resolves docket entry no. 24. A final pre-trial conference is scheduled for May 18, 2012 at 10:00 a.m.

Dated: New York, New York
       February 10, 2012

 

LAURA TAYLOR SWAIN
United States District Judge